# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Petitioner, | |
| v. | Misc. No. 10-149 (EGS/JMF) |
| CHURCH & DWIGHT CO., INC., | |
| Respondent. | |

## MEMORANDUM OPINION

This case has been referred to me by Judge Sullivan for all purposes. Pending before me now is the Petition of the Federal Trade Commission for an Order Enforcing Subpoena *Duces Tecum* and Civil Investigative Demand Issued in Furtherance of a Law Enforcement Investigation [#1] ("Pet."). The Federal Trade Commission ("FTC") seeks an order by this Court requiring that respondents Church & Dwight ("C&D") fully comply with the subpoena *duces tecum* ("subpoena") and civil investigative demand ("CID") within ten days of this order. In light of the record before me, the FTC's petition will be granted.

## I. BACKGROUND

On June 10, 2009, the FTC issued a "Resolution Authorizing Use of Compulsory Process in Nonpublic Investigation" (Pet. at 4) that defines the nature and scope of the investigation as follows:

> To determine whether Church & Dwight, Co., Inc. has attempted to acquire, acquired, or maintained a monopoly in the distribution or sale of condoms in the United States, or in any part of that commerce, through potentially exclusionary practices including, but not limited to,

conditioning discounts or rebates to retailers on the percentage of shelf or display space dedicated to Trojan brand condoms and other products distributed or sold by Church & Dwight, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. Section 45, as amended.

Pet., Exh. 2.

In conjunction with the investigation, the FTC issued a subpoena and CID seeking documents and data from C&D concerning its "Planogram" incentive programs for retailers of Trojan condoms. Pet., Exhs. 3 and 4.  Both the subpoena and the CID bore hearing dates of July 30, 2009. Id.  C&D did not comply with this deadline, did not seek an extension of the deadline, and neither attempted to limit the requests nor quash them at that time.  Pet. at ¶14.  Instead, C&D produced a "detailed written response" to the CID on September 18, 2009.  See Church & Dwight Co., Inc.'s Opposition to the Petition of the Federal Trade Commission for an Order Enforcing Subpoena Duces Tecum and Civil Investigative Demand [#15] ("Opp.") at 4.

On October 28, 2009, the FTC contacted C&D concerning deficiencies in C&D's response to the subpoena, and set a new compliance deadline of November 20, 2009, with which C&D did not comply. Pet. at ¶18.  On November 12, 2009, C&D filed a petition asking the FTC to quash or limit the subpoena and CID to the extent that each defined the "Relevant Area" as including Canada, and each requested both documents and information from Canada. Id. at ¶19.  On December 4, 2009, C&D filed a request to file out of time an additional petition to limit or quash the subpoena to the extent that it required production of "confidential information regarding non-condom products," and further requested that it be allowed to redact discoverable documents to the extent they contained confidential and proprietary information concerning products other than condoms. Id. at ¶20.  On December 23, 2009, the FTC denied the two petitions, and set a

new compliance deadline of January 26, 2010, with which C&D did not comply. Id. at ¶21-24.  On February 26, 2010, the FTC filed this petition.

## II.  DISCUSSION

### A.  Relevancy of Documents Located with C&D's Canadian Subsidiary

In both the subpoena and the CID, the FTC defines "Relevant Area," as used in conjunction with the location of C&D's customers, as including both the United States and Canada. Pet., Exhs. 3 and 4.  C&D objects to this definition on two grounds.  First, C&D says that documents from their Canadian subsidiary are not relevant, based on the plain language of the resolution authorizing the investigation. Opp. at 10-11. Furthermore, C&D says that, even if the documents could be relevant, the production of documents from their Canadian subsidiary would be overly burdensome. Id. at 16.

1.      *The Canadian documents are sufficiently relevant to the investigation*

C&D argues that the language of the resolution limits the scope of inquiry to the United States, in that it seeks to determine whether C&D "attempted to acquire, acquired, or maintained a monopoly in the distribution or sale of condoms in the United States." Id. at 11.  This is, however, a particularly narrow reading of the resolution.  Of course the outcome of an ITC investigation will concern activities in commerce in the United States; the FTC does not, presumably, seek the documents in an effort to determine whether C&D attempted to acquire a monopoly on the male condom market in Canada.  This does not mean, however, that the investigation must be restricted to economic activities in the United States, and to thereby conclude that it is impossible for activities of a Canadian subsidiary to have aided C&D in securing a monopoly in the United States, or for such activities to shed light on the investigation.  That would mean that the Court would be

premising the quashing of the subpoena by assuming what the investigation is designed (at least in part) to determine–whether, in examining C&D's lower market share in Canada versus that in the United States, C&D engaged or is engaging in activities in the United States that constitute unfair competition. It cannot be true that in a globalized economy a federal agency may never investigate the activities of foreign subsidiary of an American company merely because the agency's original grant of authority is the investigation of economic activity that has had an impact on interstate commerce within the United States.

Requiring the agency to, in effect, prove what it is investigating as a condition of the legitimacy of the investigation it is conducting is contradicted by the case in this Circuit most on point as to the breadth of FTC subpoenas and investigative demands. FTC v. Texaco, 555 F.2d 862 (D.C. Cir. 1977) (en banc). The court in that case evaluated subpoenas issued by the FTC to seven natural gas producers as part of an investigation into the procedures employed by various producers in reporting their gas reserves to the American Gas Association (AGA). Texaco, 555 F.2d at 866. The gas producers contended that the subpoenas should have been limited on the basis of relevance. Id. at 873. The court determined that the standard for limiting a subpoena issued by the FTC was one of "reasonable relevance." Id. Furthermore, a district court could not "lose sight of the fact that the agency is merely exercising its legitimate right to determine the facts, and that a complaint may not, and need not, ever issue." Id. at 874. Speculations made by the FTC as to the possible relevance of the disputed information were sufficient as long as they were not "obviously wrong." Id. at 877 n.32.

One of the issues in <u>Texaco</u> concerned the FTC's subpoena of the Superior Oil Company ("Superior"), who was not a member of the AGA, and did not report reserve estimates to the AGA. <u>Id.</u> at 877. Superior argued that they could not be guilty of a conspiracy to underreport reserve estimates to the AGA, and the district judge denied enforcement of large portions of the subpoena. <u>Id.</u> In reversing the district court, the Court of Appeals noted that "the FTC's investigation is not restricted to this theory [of a conspiracy to underreport]," and that "comparison of Superior's estimating process with that of a producer who does report to the AGA could be a useful analysis." <u>Id.</u> Certainly it is plausible that methods for the sale and marketing of male condoms by C&D Canada may be similarly useful to an investigation and analysis of C&D's practices in the United States.

C&D further objects to the relevance of the Canadian documents on the basis of an alleged explanation from FTC staff "that Canadian documents will enable its internal economist to conduct a 'natural experiment' involving the comparison of Church & Dwight's sales, marketing practices and market share for condoms in Canada with the separate United States condom market." Opp. at 6. C&D cites a case concerning a preliminary injunction to prevent a merger for the FTC's definition of "natural experiment": "'Natural experiments,' i.e., evidence that the posited harm has occurred under circumstances similar to the proposed transaction, are relevant to merger analysis." <u>FTC v. Foster</u>, 2007 WL 1793441 at *38 (D.N.M. May 29, 2007). From this statement, C&D concludes that "the FTC's Staff has never made the requisite showing of market similarity." Opp. at 12. There is no such "requisite showing," however; a description in a very different circumstance of a general concept does not create a legal standard.

C&D goes on to challenge the FTC's "natural experiment" on the basis of

Daubert v. Merrell Dow Pharma., Inc., 509 U.S. 579 (1993), noting that the FTC staff

"has not offered any indication or independent support whatsoever of a 'credible link' or

'nexus' between the United States and Canadian markets for male condoms that would

enable the present natural experiment to later survive Daubert scrutiny." Opp. at 13-14.

C&D is putting the cart well before the horse.  In the first instance, the "natural

experiment" comment by FTC staff is irrelevant.  "[W]hen a conflict exists in the parties'

understanding of the purpose of an agency's investigations, the language of the agency's

resolution, rather than subsequent representations of Commission staff, controls."  See

FTC v. Invention Submission Corp. ("ISC"), 965 F.2d 1086, 1088 (D.C. Cir. 1992).

Whatever FTC staff may have said in support of the relevancy of documents and

information from C&D's Canadian subsidiary, there is no "natural experiment" language

to be found in the resolution or the subsequent subpoena and CID.

Furthermore, C&D attempts to apply far higher standards of evidence to the FTC

investigation than are applicable at this stage.  In U.S. v. Morton Salt Co., 338 U.S. 632

(1950), the Supreme Court noted the difference between "the judicial function and the

function the Commission is attempting to perform": "The only power that is involved

here is the power to get information from those who best can give it and who are most

interested in not doing so." Id. at 641-2.  The Court compared the power to that of a

Grand Jury, which "can investigate merely on suspicion that the law is being violated, or

even just because it wants assurance that it is not." Id. at 642-3.

It is not the place of the district court to speculate as to possible charges that

might result from an investigation, and then to determine the relevance of the subpoena

requests in that light. <u>See</u> <u>Texaco</u>, 555 F.2d at 874. The "substantive antitrust issues" raised by C&D have no bearing at the investigative stage, when it may be that no complaint will ever issue. Opp. at 15.

Returning to the matter at hand, the FTC explains that materials from C&D's Canadian subsidiary "will assist in determining the factors that affect C&D's market shares in these adjacent markets," as C&D has a far smaller share of the male condom market in Canada than in the United States. <u>Reply of Petitioner Federal Trade Comission to the "Church & Dwight Co., Inc.'s Opposition to the Petition of the Federal Trade Commission for an Order Enforcing Subpoena Duces Tecum and Civil Investigative Demand"</u> [#18] ("Reply") at 5. Without speculating as to the outcome of the investigation, the explanation is sufficient to demonstrate that the Canadian documents are "reasonably relevant," and not "obviously wrong."

> 2. *C&D has not sufficiently shown that production of documents and information from their Canadian subsidiary is unduly burdensome*

C&D further objects to production of documents from their Canadian subsidiary on the basis that such production would be overly burdensome to C&D.

Under <u>Texaco</u>, the standard for showing that a request is unduly burdensome or unreasonably broad is a high one. <u>See</u> <u>Texaco</u>, 555 F.2d at 882. Some burden on the subpoenaed party is to be expected, and the burden of showing that the request is unreasonable is on the subpoenaed party. <u>Id.</u> If an agency inquiry is pursuant to a lawful purpose, and the requested documents are relevant to that purpose, that burden is not easily met, and courts have required a showing that compliance "threatens to unduly disrupt or seriously hinder normal operations of a business." <u>Id.</u> There is no affidavit or other supporting proof that would permit that conclusion. Reply at 13. Moreover, as

indicated by the parties' agreements concerning search terms for searching documents in the United States, there may be electronic means of searching the data that the parties can mutually agree upon to keep the burden to the minimum. See generally THE SEDONA CONFERENCE, THE SEDONA CONFERENCE COMMENTARY ON PROPORTIONALITY IN ELECTRONIC DISCOVERY, 11 Sedona Conf. J. 289, 300-301 (2010). (Principle 6: Technologies to reduce cost and burden should be considered in the proportionality analysis).

C&D asserts that production of documents from C&D's Canadian subsidiary will be a tremendous burden, as the Canadian subsidiary has a different document management and retention system from C&D in the United States. Opp. at 17. While the FTC proposed that the review of documents in Canada could be limited through search terms, C&D objects, as C&D Canada's document management system does not allow for keyword searching to limit the review process. Id. Again, however, these claims are not supported by declarations or other evidence that are probative of the costs C&D would have to bear. Reply at 14.

Until a genuine effort is made by both parties to achieve the information demanded at the lowest possible cost fails, there are no clear grounds to consider C&D's claim of burdensomeness. It should be postponed until then.[1]

## B. C&D's Redactions of Information Pertaining to Products Other than Condoms

---

[1] C&D claims that the FTC staff initially agreed that C&D would first produce documents relating to the sale and marketing of condoms in Canada only to the extent that those documents were in the possession of the custodians selected by the FTC in the United States. Opp. at 5. However, while the FTC acknowledged in a November 4, 2009 letter to C&D that such an arrangement had been proposed by C&D, it was never agreed upon, and the FTC never agreed to forgo any Canada-held documents. Pet., Exh. 6 at Exh. C at 1.

1.    *The redacted materials are sufficiently relevant in light of the resolution*

C&D asserts that it seeks to redact information from the documents it produces regarding "proprietary and confidential information on non-condom products that is entirely irrelevant to the FTC's investigation involving condoms." Opp. at 19.  C&D quotes the FTC's petition as stating that the investigation seeks to determine whether C&D has engaged in unfair competition "*with respect to its Trojan brand condoms*." Id. (emphasis in Opp.).  The FTC resolution itself states that the investigation will concern itself with "potentially exclusionary practices including, but not limited to, conditioning discounts or rebates to retailers on the percentage of shelf display space dedicated to Trojan brand condoms and other products distributed or sold by Church & Dwight." Pet., Exh. 2.  In response, C&D alleges that "other products" is " clearly intended" only to address other non-Trojan brand condom products made by C&D. Opp. at 19.

That intent, however, is not so clear.  As noted above, it is the language of the FTC resolution, not subsequent statements by its staff, that governs the investigation. ISC, 965 F.2d at 1088.  In Texaco, that language was construed broadly.  While the resolution in question in that case defined the scope of the investigation to determine whether certain corporations were "engaged in conduct in the reporting of natural gas reserves for Southern Louisiana," the court held that the subpoena should be enforced against Superior, a company who did not engage in reporting natural gas reserves. Texaco, 555 F.2d at 877.

By the broad standards of Morton Salt and Texaco, it is entirely plausible that information appearing in the same document with relevant information concerning C&D's male condoms would itself be relevant to the investigation.  The requested

materials, including those portions that do not obviously concern male condoms, need only be reasonably relevant to the investigation, not to any potential outcome. ISC, 965 F.2d at 1090.

2. *The standard for relevancy in an FTC investigation is not the same as that for post-complaint litigation*

In response to the subpoena instruction requiring that produced documents be unredacted, C&D states that "the FTC cannot simply assert that such policies and regulations allow it to require the production of any documents . . . without showing, like any litigant, that the documents demanded will lead to reasonably relevant and ultimately admissible evidence." Opp. at 9. This statement mischaracterizes the nature of an FTC investigation. No complaint has been filed–it may be no complaint will ever be filed. The FTC is not "like any other litigant," because it is not engaged in litigation with C&D. As the Supreme Court noted in Morton Salt, "[b]ecause judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry." Morton Salt, 338 U.S. at 642. At the pre-complaint stage, the court is not free to speculate as to possible charges in a future complaint, and then to determine the relevance of the subpoena requests on that basis. Texaco, 555 F.2d at 874.

C&D further claims that the FTC is "attempting . . . to be the sole judge of relevancy," and that Texaco and later cases stand for the proposition that "that job is one for the judicial branch alone." Opp. at 24. This interpretation of Texaco is off the mark. While it may be the place for the court to determine relevancy in a circumstance such as this, Texaco sets the bar for that relevancy very low, and limits its power to question the

judgment of the investigating administrative agency. <u>Texaco</u>, 555 F.2d at 872 ("[W]hile the court's function is neither minor nor ministerial, the scope of issues which may be litigated in an enforcement proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity") (internal citations omitted).

3. *C&D's alternative proposal concerning* in camera *review of documents is untenable and inappropriate*

C&D proposes an "alternative ruling" that is "often implemented in such complex litigations." Opp. at 25. C&D suggests that the Court (1) allow C&D to continue redacting information it judges to be confidential, proprietary, and irrelevant in a manner that preserves its context; (2) require the FTC to "timely approach" C&D's counsel with specific objections regarding particular redactions; and (3) require C&D to consider the redaction. Then, if the parties cannot resolve a redaction issue after good faith efforts, the parties will submit the redacted document for the Court's *in camera* review for a ruling on whether the redaction should stand, or whether the document should be produced in its entirety.

This ruling would be inappropriate on a number of levels. First, C&D attempts to improperly shift its burden of proving that the redacted information is irrelevant. <u>See</u> <u>ISC</u>, 965 F.2d at 1090 ("[I]n light of the broad deference we afford the investigating agency, it is essentially the respondent's burden to show that the information is irrelevant"). Second, it places the court in an inappropriate position at this stage of the investigation. "The Supreme Court has made it clear that the court's role in a proceeding to enforce an administrative subpoena is a strictly limited one." <u>Texaco</u>, 555 F.2d at 871-72. For the court to review individual documents for their relevance at this pre-complaint

stage would invite speculation as to what possible charges might be included in a future complaint, and cause the Court to lose sight of the FTC's legitimate right to determine the facts. Id. at 874. Third, contrary to C&D's characterization, this is not a "complex litigation." To put such a scheme in place would elevate it to something well beyond what it should be–an administrative investigation, which is proper "if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." Morton Salt, 338 U.S. at 652.

### III. CONCLUSION

For the reasons stated herein, the Petition of the Federal Trade Commission for an Order Enforcing Subpoena *Duces Tecum* and Civil Investigative Demand Issued in Furtherance of a Law Enforcement Investigation will be granted. A separate Order accompanies this Memorandum Opinion.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE